UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

MELINDA DAWN LIGHT )
)
V. )                    NO.  2:09-CV-22
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The plaintiff has filed this action for judicial review of the denial of her applications for disability insurance benefits and supplemental security income under the Social Security Act following a hearing before an Administrative Law Judge ["ALJ"].  The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 10], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 13].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988).  "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971).  It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966).  The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff was 31 years of age at the time of her hearing. She had a limited education. Her past relevant work experience was as a Certified Nursing Assistant which was semi-skilled and medium exertionally, and as a cook which was unskilled and light. She alleged disability on the basis of degenerative disc disease, low back pain, right lower extremity pain, major depressive disorder, and an anxiety disorder.

The plaintiff's medical records which were before the ALJ are summarized in defendant's brief as follows:

> The record reflects Plaintiff received treatment at the Centerpointe Medical Clinic, LLC, ("Centerpointe"), primarily with Ina Bone, ANP (Certified Advanced Nurse Practitioner), and Elizabeth Krell, FNP (Family Nurse Practitioner) from December 2003 through February 2007 (Tr. 122-72). They diagnosed a variety of conditions, including neck pain, low back pain, thoracic back pain, degenerative disc disease, osteoarthritis, right lower extremity pain, parasthesias, hyperthyroidism, hypertension and sinusitis (see, e.g., Tr. 122, 123, 124, 125, 126, 156). Ms. Bone prescribed medication for Plaintiff, including Percocet$_2$, Soma, Firoicet, and Valium (see, e.g., Tr. 123, 124, 125). At various times, Ms. Bone discussed and taught controlled substances agreement/policy, tolerance/dependence with controlled substances, medication dose/schedules/side effects, disease process, smoking cessation, weight loss, diet, and cholesterol management (see, e.g., Tr. 122, 123, 124, 129, 132). When Plaintiff was seen in July 2005, it was noted that pain medication controlled her pain (Tr. 136).

> In May 2006, Ms. Bone provided counseling about stress control and parenting with controls (Tr. 132). In June 2006, Ms. Bone prepared correspondence "To Whom it May Concern" and reported that Plaintiff had been a patient at Centerpointe for over two years, had multiple medical problems, and was unable to work (Tr. 131). She indicated that Plaintiff would be re-assessed for return to work in six months; however, she felt that it was unlikely that Plaintiff would be able to work in the future (Tr. 131).

> July 2006 treatment notes reflect that Ms. Bone provided counseling about increased triglycerides, diet, and exercise (Tr. 129). In August 2006, Ms. Bone commented that she did not believe Plaintiff could return to work (Tr. 128). October 2006 progress notes show that Ms. Bone noted that Plaintiff "must have time for self" (Tr. 126).

2

A December 2006 MRI of Plaintiff's lumbar spine revealed some enhancing scar identified to the right of the midline at the level of the L5-S1 disc space; mild to moderate bilateral exiting nerve root encroachment was suggested there as well with a generalized anterior-posterior disc bulge, best appreciated on parasagital images; and the remainder of the lumbar spine was essentially unremarkable (Tr. 160-61). Continued clinical correlation was recommended (Tr. 161). A December 2006 MRI of Plaintiff's cervical spine demonstrated posterior bulges of the discs were present at the C6-7 and T3-4 disc levels without evidence of additional abnormality (Tr. 157).

Ms. Bone and Plaintiff discussed the MRI report and noted nerve root encroachment at L5-S1 (Tr. 124). Ms. Bone indicated that Plaintiff did not want to see a surgeon (Tr. 124). She instructed Plaintiff not to lift greater than ten pounds (Tr. 124).

In February 2007, Plaintiff was discharged from Centerpointe related to her failing to present for a pill count with her husband, who took exactly the same medications (Tr. 122). Plaintiff stated that her husband should have been dismissed and she should not have been (Tr.122). Ms. Bone did not prescribe any Percocet (Tr. 122).

Dr. Misra, a state agency physician, reviewed the record evidence in January 2007 and concluded Plaintiff could perform light exertional work with occasional postural movements (Tr. 196-203). Dr. Bell, also a state agency physician, reviewed the record evidence in May 2007 and concluded Plaintiff could perform light exertional work with no additional limitations (Tr. 230-38).

Plaintiff began treating with physicians at ETSU Family Physicians of Kingsport in August 2007 (Tr. 255-63). In August 2007, Plaintiff complained of low back pain that radiated down her right leg to her little toe and muscle spasms in the right lower back and lateral aspectof her right thigh (Tr. 258). Plaintiff's pain was worse when lifting her fifteen-month-old daughter (Tr. 258). Dr. Kerney examined Plaintiff and diagnosed sciatica, morbid obesity, tobacco abuse, hypertension, polycystic ovaries, dyslipidemia, and depression/anxiety (Tr. 258-59). Dr. Kerney gave Plaintiff a handout on back exercises and encouraged her to do them once per day until her next office visit (Tr. 259). Dr. Kerney explained the benefits of weight loss and Plaintiff agreed to begin a structured diet and set a goal of losing ten pounds by the next office visit (Tr. 259). Plaintiff also agreed to try to stop smoking by the next office visit (Tr. 259).

When Plaintiff returned in September 2007, she reported no change in back pain and stated that it was made worse with prolonged standing and lifting her seventeen-month-old child (Tr. 256). Plaintiff also continued to smoke (Tr. 256). Dr. Kerney repeated Plaintiff's diagnoses and noted that Plaintiff would continue to do back exercises fifteen minutes per day (Tr. 257). He wrote Plaintiff a prescription for Weight Watchers, counseled Plaintiff on the benefits of weight loss, and Plaintiff

agreed to start walking thirty minutes three times per week (Tr. 257). Dr. Kerney also prescribed Chantix and Plaintiff agreed to stop smoking by the next office visit (Tr. 257).

In December 2007, Plaintiff returned to Dr. Kerney and had gained twenty-one pounds since her last visit and was concerned about her weight (Tr. 254). She had not been routinely walking due to the cold weather, but she reported that she started drinking diet drinks two weeks prior to the visit (Tr. 254). Plaintiff said she was limited in her amount of walking by her low back and hip pain (Tr. 254). She did not go to Weight Watchers, even though Dr. Kerney had given her a prescription for it at her last visit (Tr. 255). He instructed Plaintiff to increase her
physical activity and to eat more vegetables and less fatty foods, as well as decrease carbohydrates (Tr. 255). Dr. Kerney reinforced the need and benefits of weight reduction (Tr. 255). Plaintiff was smoking three to four cigarettes per day and Dr. Kerney praised her smoking reduction and encouraged her to set a stop date (Tr. 255).

The record reflects that Plaintiff sporadically received mental health treatment at Frontier Health since November 2004 (Tr. 240-52). In November 2004, it was noted that Plaintiff was seen for follow up of medication and had a history of major depression (Tr. 252). Plaintiff reported doing fairly well, but continued to have marital discord (Tr. 252). She returned in February 2005 and reported doing fair; she and her husband had had marital difficulties and had separated (Tr. 251). When Plaintiff returned in July 2005, she reported that she had been doing well and had recently gotten remarried and her husband treated her very well (Tr. 250).

Dr. Welch, a state agency psychologist, reviewed the record evidence in December 2006 and concluded that Plaintiff was able to understand, remember and complete detailed tasks on a regular and continual basis, with occasional difficulty sustaining concentration, persistence, or pace (Tr. 174-76). He noted that Plaintiff was able to interact with small groups, one-on-one, and have occasional or superficial, not continual, general public interaction (Tr. 176). Dr. Welch did not anticipate any major problems with supervisors or co-workers (Tr. 176). Dr. Welch indicated that Plaintiff was able to adapt to routine, not frequent or fast-paced, change (Tr. 176). He believed Plaintiff could avoid major hazards and take most transportation independently (Tr.176). Dr. Welch reported that Plaintiff was able to set and carry out most long-range goals with
only occasional assistance (Tr. 176).[1]

In April 2007, Rebecca Joslin, a state agency psychologist, also reviewed the

---

[1] In addition to his assessment, which defendant correctly summarizes, the form contained a "worksheet" in which Dr Welch rated the plaintiff's degree of limitation in various areas, as a part of the process of completing the functional capacity assessment. These are at pgs. 174 and 75, and will be discussed in detail hereinafter.

4

record evidence and concluded Plaintiff was able to understand and remember, with some difficulty, detailed tasks and was also able, with some difficulty, to carry out detailed tasks and maintain attention, concentration, persistence, and pace (Tr. 208-29). She noted that Plaintiff was able, with some difficulty, to interact appropriately with the general public and with others without behavior extremes (Tr. 210). According to Dr. Joslin, Plaintiff was able, with some difficulty, to adapt to changes (Tr. 210).

It appears that Plaintiff did not return to Frontier Health until June 2007 (Tr. 248-49). Dr. Sullivan diagnosed recurrent major depressive disorder, severe with psychotic features, and generalized anxiety disorder and prescribed medication (Wellbutrin and BuSpar) (Tr. 249). Plaintiff stated that her primary care physician (PCP) was giving her Valium, however, Dr. Sullivan brought it to her attention that Valium would not be prescribed at that time (Tr. 248).
Plaintiff returned to Dr. Sullivan in August 2007 and stated that she had been doing well over the past several weeks and had not had any problems with her medication and no side effects (Tr. 247).

Also in August 2007, a "Q-Sheet" was prepared by Frontier Health, and it was noted that Plaintiff presented with social/interpersonal problems and depression or mood disorder (Tr. 244). Plaintiff reported that she was no longer able to get Valium from her previous nurse practitioner, because the nurse practitioner had told her that she would no longer treat her, and she had
received it at Frontier Health in the past (Tr. 244-45). Plaintiff found a primary care physician, but he would not prescribe Valium or pain medication for her (Tr. 244-45). Plaintiff stated that she continued to have much stress in her life and was easily upset and agitated (Tr. 244). She said that she "just [did not] know how she [would] 'survive' without the Valium" and also said that she had constant pain and was sometimes not able to keep up with her fourteen-month-old child (Tr. 245). Plaintiff's diagnoses were listed and she was assigned a Global Assessment of Functioning of 50 [2] (Tr. 245).

In December 2007, Dr. Sullivan, Plaintiff's psychiatrist, and her therapist completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" form and noted that Plaintiff's last visit was in November 2007 (Tr. 242-43). They reported that Plaintiff had severe limitations in her ability to understand and remember because she was easily confused when stressed (Tr. 242). Dr. Sullivan and the therapist also indicated that Plaintiff had severe
limitations in adaptation and, due to poor concentration, Plaintiff would be in danger

---

[2] A GAF of 41-50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 34 (4th ed. Text Revision 2000) (DSM-IV-TR).

in the workplace if there were normal hazards (Tr. 243). They also commented that Plaintiff had complaints of chronic pain (Tr. 243).

In January 2008, Dr. Sullivan reviewed Dr. Welch's assessment of Plaintiff's mental functioning and indicated that he agreed with it (Tr. 264-67).

[Doc. 14, pgs. 4-11].

At the hearing, the ALJ called Dr. Norman Hankins, a Vocational Expert ["VE"]. He asked Dr. Hankins to assume a person of the plaintiffs age, education and work experience. He then asked him to assume that the plaintiff had the exertional capacity opined by State Agency physician Dr. Bell in May, 2007 (Tr. 230-38), which was a capability for light work with no other physical limitations. He was then asked to limit the person "to simple, routine repetitive with occasional contact with the public, coworkers, and supervisors." When asked if there were jobs such a person could perform, Dr. Hankins identified the jobs of office cleaners, hand packer, assembler or checker, and sorter. He stated that there were 60,000 such jobs in the regional economy and 3,000,000 in the national economy. (Tr. 304-05).

Based upon Dr. Hankins' answer to his question, the ALJ found the plaintiff was not disabled. (Tr. 28).

Plaintiff asserts that the ALJ erred in three respects. First, she says the ALJ erred in his finding of her residual functional capacity for simple, routine repetitive light work that requires no more than occasional contact with the public, co-workers and supervisors. Second, she asserts the ALJ erred in his assessment of plaintiff's credibility regarding her description of her level of pain. Finally, he asserts that the ALJ erred in not considering the non-exertional mental limitations found by the state-agency physicians and the plaintiff's treating psychiatrist, Dr. Timothy Sullivan.

6

It is not necessary to address all of these issues in detail, because one fact is determinative of this case. As noted by the ALJ, Dr. Sullivan agreed that the assessment of Dr. Welch, the State Agency evaluator, was correct (Tr. 264). At the hearing, after the ALJ examined Dr. Hankins, plaintiff's counsel asked if the number of jobs would decrease if the plaintiff had the limitations set forth in Dr. Welch's report on the plaintiff's residual functional capacity, which was Exhibit 3F in the claims folder. Dr. Hankins appears to have been familiar with Exhibit 3F (Tr. 174-77), and appears to have been looking at it when he responded to counsel's question. He said "[y]es, 3F had 12, 12 moderate physical limitations. Yeah, I think that, those would be, I think those would be cumulative in effect. No, I don't really believe she would be able to work with that many moderate limitations." (Tr. 306).

In his mental assessment, before he set out his "mental capacity assessment" at Tr. 175, Dr. Welch completed a two page "Summary Conclusions" portion of the form. (Tr. 174-75). The form says that "[e]ach mental activity is to be evaluated within the context of the individuals capacity to sustain that activity over a normal workday and workweek, on an ongoing basis." In this portion of the form, Dr. Welch opined that the plaintiff was "moderately limited" in (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; (5) the ability to sustain an ordinary routine without special supervision; (6) the ability to work in coordination with or proximity to others without being distracted by them; (7) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms

7

and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) the ability to interact appropriately with the general public; (9) the ability to accept instructions and respond appropriately to criticism from supervisors; (10) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (1) the ability to respond appropriately to changes in the work settings.

As the Commissioner argues in his brief, "these checkmarks do not represent Dr. Welch's ultimate mental residual functional capacity opinion." [Doc. 14, pg. 17]. That comes on page 175, and the ALJ appears to have attempted to fashion his hypothetical to Dr. Hankins based upon it. However, Dr. Hankins, perhaps misunderstanding the form and perhaps not,[3] opined that no jobs exist that a person with moderate limitations in those 12 areas could perform. This is far too serious a circumstance to ignore, since Dr. Hankins testimony provides the substantial evidence upon which the ALJ's ultimate decision relied.

The Court is also troubled regarding the exclusion from the record of the report of consultative examination performed for the State Agency by psychologist Pamela Branton on February 1, 2006. As pointed out by the Commissioner, Dr. Welch saw it (Tr. 193). If the ALJ saw it, he didn't mention it. The Commissioner then more or less says "so what," arguing that it was not in the record. Well, it was not the plaintiff's fault that someone did not put it in the record. It opined that the plaintiff had mild to moderate limitations, except in the area

---

[3] The Court notes that Dr. Hankins has appeared as a vocational expert in dozens of Social Security cases and presumably has looked at such forms on myriad occasions preparing for his testimony. However, this Court's recommendation is not based upon this logical conclusion.

of "Social Interactions," where the plaintiff could "at times" be "markedly limited." [Doc. 10-2, pg. 6]. The ALJ should address Ms. Branton's report on remand.

At best, the plaintiff's mental functional capacity is in disarray. It could be strongly argued that Dr. Hankins' response to the question from plaintiff's counsel mandates an award of benefits. However, the Court does not feel that this case should be adjudicated with such uncertainty. The case should be remanded for further evaluation of the plaintiff's mental impairment. The Court would also strongly recommend that the Commissioner obtain a consultative physical examination, and not rely solely on the reports of non-examining State Agency physicians. It is therefore respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 10] be GRANTED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 13] be DENIED.[4]

Respectfully submitted:


_s/ Dennis H. Inman_____
United States Magistrate Judge

---

[4]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

9